Hemphill, C. J.
The appellee, as administratrix of the succession of Juan de Casinova, claimed under the 11th section of the act of February 4, 1841, “ supplementary to an act to detect fraudulent land certificates,” etc., a certificate for a league and labor of land, and recovered judgment for the amount of her claim. It was proven “ by witnesses, Manchaca and Rodrigues, that the plaintiff’s intestate was a married man, residing in Texas at the date of the declaration of independence, and head of a family; that he did not abandon the country to avoid a participation in the struggle during the spring of 1836; that he did not aid or assist the enemy. The witnesses also proved that the plaintiff’s intestate, with his wife and family, left the late republic in the campaign with Gen. Woll and the Mexican army, when they returned on the invasion of 1842; that the reason for the plaintiff’s intestate and some others leaving was the fear and apprehension that the Americans would hill them when the Mexican army should leave. The witnesses also proved that the plaintiff’s intestate never did return, but died in the town of Presidio, on the west side of the Rio Grande, he then being on his return to Texas with his family; that the fears and’apprehensions of the deceased were caused in consequence of a rumor circulated and generally credited in San Antonio at the time of his departure, that the Americans had rnur-dered the families of Jose Antonio Havarro and Jose Cardenas on the Guadaloupe, and had threatened to hill all the Mexican born citizens of San Antonio; that the deceased was a very old and infirm man, and left with the'intention of returning, as the witnesses believed, so soon as the excitement which he feared should have subsided.
The question presented is, whether on the above facts, the applicant was, under the laws of the country regulating the subject-matter, entitled in her representative capacity to the certificate for which she applied.
*(288) By the 11th section of an act, entitled an act “ To reduce into one act and to amend the several acts relating to the establishment of a general land office,” approved December 14, 1837, a board of land commissioners was created, with power to investigate all claims on the government for headrights to lands, and they were authorized to grant a certificate of the claims, on sueh proof being made as was required by that law. By the 11th section of an act supplementary to an act to detect fraudulent land certificates, approved February 4, 1841, 5 Laws, p. 171, individuals entitled to headright certificates of the first class are authorized to file their petitions in the district court, and on compliance with all of the formalities prescribed by that act, and on obtaining a verdict of a jury, etc., a certificate would finally issue for the proper amount of the claim. Under this section of the latter act the claim is made — and one of the required formalities is, that it should be proven in the same manner as provided by the latid law of 1837. The appellant alleges that it should have been averred and proven that the appellee resided in Texas from the declaration of independence up to the institution of the suit, and the appellee contends that the departure of the deceased from the republic is satisfactorily explained — that he left ani/mo revertendi, and did not lose any of his rights as a citizen by his absence.
It is not contended that the claim could be substantiated in any other mode or by any other proof than as is required by the laws authorizing the investigations to be made. It may be taken, then, as conceded that the power to hear and determine these applications against the government must be exercised in the special mode prescribed as a limitation on that power. The mode, then, becomes an essential ingredient of the authority; a condition precedent, on the performance of which the jurisdiction depends, and without which its exercise is contrary to law.
The power conferred must be pursued according to its terms; and its limitations as effectually prohibit the court from the confirmation of land claims not supported by the proofs required by the law, as if all other claims had been declared and rendered null and void by the proper authorities of the country. It is not to be understood, however, that they are null and void, but simply that they cannot be established except on proof of the facts designated by the statute.
Board of Land Commissioners v. Jesse Walling, Dallam, p. 524; John Smith T. v. The United States, 10 Pet. 327; Voorhees v. The Bank of the United States, id. 450; Griffith v. Frazier, 8 Cranch, 9.
The question is not solely whether the claimant was entitled under the colonization law or by the constitution; but, in relation to the *(289) point now under examination, whether he can show that he was a citizen at the date of the declaration of independence, and continued so up to the time of this application. Before proceeding, however, with this examination, we will inquire into the true import of the terms “ present time,” up to which the party must prove his actual citizenship, and whether by the phrase is meant the period of the passage of the land law, or of the claimant’s application. The provision in which the terms are found is expressed as follows, viz.: “They shall also be required to prove by two or more good and creditable witnesses, as the commissioners may require, that they were actually citizens of Texas at the date of the declaration of independence, and have continued so to the present time.” We have given the subject an attentive examination, as doubts have been entertained as to the true construction, and from some dicta of the late supreme court, an impression was entertained that the date of the passage of the law was the intended period. This, it is believed, is an erroneous exposition. The proceedings before the commissioner must be regarded as one entire act. When the claim is under investigation the commissioners are to require proof of actual citizenship up to the present time. This cannot be rationally construed to be any other period than the very instant when the proof is adduced.
In the oath taken by the claimant, he swears that he had not “previously received a title to his quantum of land.” If the oath had been that he had not, previously to the present time, received, etc., there could be no doubt that the term then would refer to the very instant of the administration of the oath and not to the passage of the law. There can, it is believed, be as little uncertainty as to their true meaning in the connection in which they are found.
That this in the proper interpretation is deducible, also, by construing it in pari materia with a subsequent portion of the same section in which the purchaser of a headright is required to prove that his vendor is actually a resident of the republic at the time the application for the grant is made. These terms leave no doubt on the mind, and remove all ambiguity, if there be any, in the phrase previously used — for it cannot be supposed, unless the language is too plain to be misunderstood, that the purchaser shall be compelled to prove the actual residence of his assignor at the date of the application, while the assignor, applying in his proper person, can satisfy the law by proof of residence up to the passage of the act, but no longer.
This would be an odious discrimination and a grievance inflicted on an assignee without object or purpose. It would be the exercise of a capricious despotism, which is not to be attributed to branch of *(290) the government when their acts, by the legitimate rules of construction, are susceptible of a different exposition. Having premised these observations, not as essential to the decision of the point raised, but as arising in all cases of this' class of headrights, where the suit is brought under the 11th section of the act of 1841, it being an original application for the recognition of the claim, I proceed to consider whether continuous residence or actual citizenship from the date of the declaration of independence up to the death of the intestate has been established in the manner prescribed by the land law of 1837.
His residence, from the declaration of independence until 1842, is not disputed; and it is contended that his citizenship was not, under the circumstances, interrupted by his flight with and under the protection of the hostile forces, and his remaining on the soil and under the government of the enemy until the hour of his death. The question now is, not whether he lost all his rights as a citizen by his desertion and flight to a foreign land, but whether his actual residence and inhabitancy in his new domicile are not incompatible with his pretensions to continuous residence and citizenship in this republic.
It is, perhaps, unnecessary to refer to any authorities on the subject of a change of domicile/ many of the distinctions are inapplicable to cases arising under the land laws of the country.
The intention of the law is, if possible, to be ascertained from the words themselves, the context and subject-matter; from the object to be attained or the policy to be promoted. From the language employed the inference is obvious that in the legislative mind, actual inhabitancy or commorancy was regarded as an essential condition precedent to the establishment of a headright claim, and it is only by a liberal construction, not inconsistent, however, with the spirit and object of the law, that an absence for temporary purposes, with 2k fixed, certai/n intention of returning has been regarded as compatible with the continuous citizenship which is required.
But, turning from our own statutes, and glancing for a moment at the doctrines as laid down in works of established authority, we find domicile described to be the true, fixed, permanent home of a person, and to which, whenever he is absent, he has an intention of returning. [Residence and intention to make it a home must concur to constitute a domicile, and, when a person has actually removed to another place with an intention of remaining there for an indefinite time, and as a place of present domicile, it becomes his place of domicile, notwithstanding he map have a floating intention to return at some future period.
We have had no argument, nor been referred to any authorities by *(291) either party, hnt we may suppose that one of the principal grounds on which this claim rests is the legal principle by which a party who leaves the new domicile that he has acquired by residence in a foreign country, and removes to his native country with intention of permanently residing there, re-acquires his original domicile even while in itinere to his native country. The principle is unquestionable, and what its results may be on the rights of a citizen generally, it is foreign to the object to inquire; but it is inapplicable in a case where the right essentially depends on continual and actual citizenship and residence up to the institution of the suit.
The mere circumstance of a visit to Mexico, although the territory of a national enemy, would not of itself interrupt the citizenship enjoined by the law. There were long intervals during'which no active hostilities were waging.
The ancient inhabitants were connected by many ties with the citizens of th$ Mexican republic, and intercourse with the enemy for the purpose of trade was expressly sanctioned by law; a visit, then, for lawful purposes altogether temporory in their nature, with a fixed intention of returning, and an actual return immediately after the conclusion of the business, would not destroy the actual citizenship without which the claim for a headright is destitute of legal merit.
But the causes which impelled the claimant to abandon his own and fly to the country of the enemy were not for the purpose of business or any other lawful purpose or reason whatever. He is represented as flying from the supposed destructive vengeance of his fellow citizens. That he had heard and credited a rumor that the families of Messrs. Navarro and Cardenas had been murdered on the Gauda-loupe by the Americans — and that they had threatened to kill all the citizens of San Antonio who were Mexican born — and believing fully in the rumors of the shocking murders, and that an indiscriminate massacre of the race would shortly ensue, he became a fugitive from his country, and sheltering himself under the protection of hostile troops, he effected his escape and found refuge in the territory of the enemy. Neither in its character or cause can this be regarded as a temporary visit for lawful purposes. A visit superinduced by such terrors must, perforce, have the characteristics of permanency — of intention to change domicile — and cannot be made lawful because the claimant chose to indulge in groundless apprehensions; at' least, it cannot be reconciled with the facts to be established in the suit.
Turning aside (to some extent at least) from the point under immediate discussion, I must take this occasion to remark that, in the *(292) flight of the claimant and others from San Antonio, there is exhibited an instance of imposition on ignorance and credulity almost unpar'alleled in the annals of wickedness or folly. Nothing had transpired, from the commencement of the war, which had cast a shade on the humanity of the Americans or which could have induced the belief that they were not as merciful in triumph as they were courageous in their strife of arms. This claimant had doubtless been a witness of their prowess in the several battles fought in the vicinity of San Antonio in 1835. lie was most probably a resident in December, when the town was assaulted,— and after five days’ continual struggle, surrendered to the American army. But even under these circumstances lie witnessed no murders in cold blood — no barbarities perpetrated and no outrages inflicted on the persons of the Mexican citizens — the humanity and valor of the conquerors were alike illustrious and without a stain upon their brightness. In the subsequent battles and victories the usages of the most civilized warfare were never violated by the Americans — and their acts furnished no grounds for the imputation of cruelty, and the credence given to these monstrous rumors must have arisen from causes altogether extraneous to the uniform conduct and character of the Americans. Those causes may possibly be imagined,— for, although the Americans had been distinguished for their humanity, yet the mind of the claimant had been accustomed to the most sanguine scenes of war. In. his youthful days he had witnessed perhaps the most revolting enormities of cruelty and bloodshed — the murder of the Spanish officers — the butchering of the inhabitants of San Antonio by the troops of Arre-dondo, and the degradation of virtuous, delicate and accomplished females, to the most menial tasks and services under the lash of a brutal soldiery. In his own town, the defenders of the Alamo were put to the sword, and the massacre of Fannin’s command was well known. With an imagination filled with such horrors, we may suppose that he was prepared to give credence to any rumors, however base, infamous or monstrous; and although they were originated and circulated by traitors and enemies to the people and government of his country.
But the witnesses say that he left with an intention of returning, as they believed, so soon as the excitement which he feared had subsided. No facts are stated in support of this belief — no contingent arrangement of his business is shown, nor are there even declarations indicative of such an intention. The circumstances of his departure repel almost conclusively all presumptions of such an intention as fixed in his mind at the time of his leaving. He flies (as the *(293) record shows), because he believes that the whole Mexican race was to be extirpated; that they would be indiscriminately hewn down and not one spared by the merciless hordes of Americans. Tortured with these horrible visions of unmitigated destruction, can it be believed that at the instant of his departure he ever intended to return and resume his allegiance to a government which had crushed all of his own race in blood and trampled in the dust all laws both human and divine? Why should he nourish such a design? Would he return, when he could expect to encounter nothing but hostile visages or the ghastly memorials of his butchered countrymen? It would require the most positive and unequivocal evidence to repel the presumption under these circumstances of an utter abandonment of the country. This is the natural inference from the facts, the legitimate result of the terrific apprehensions of the claimant.
The inferences are throughout unfavorable to the claim — and they ate not rebutted by evidence. It is not shown that he was detained as a prisoner, or under restraint or by overwhelming circumstances, or that from the moment he discovered the groundlessness of his fears he had made continued efforts to return; nor at what time he commenced his journey for that purpose. Whether a voluntary abandonment of the country at the very instant of active hostilities, and acquiring a domicile in the territory of the enemy would not under all or any circumstances forfeit the bounty of the government as distributed under her land laws, it is not perhaps necessary to positively determine. In this case no relieving circumstances have been attempted to be proved. Between his flight in 1842 and the application of his administratrix in 1846, we are not informed of his acts, except of his death in the intermediate space, and that while on his return to Texas. Such proof would be insufficient to sustain a claim, in the case of absence to a country between which and our own there existed the most friendly relations.
In Skidmore v. The Republic, it was decided in substance that where the conduct of a party relative to inhabitancy, intention of remaining while in the country, and certainty of returning on departure from it was equivocal, he was not entitled to the liberality of the republic. Dallam, 581. The doctrine on the change of domicile, so far as the same was regarded as applicable to the provisions of' land laws relative to continuous residence, was well considered in that case, and it is not intended to depart from the restrictions in that decision.
Had the party proved that on ascertaining the falsehood of the rumors which had shocked him out of his allegiance and drove him *(294) forth as a fugitive (and of this he must have been cognizant long before he reached the Dio Grande), and had he then abandoned the enemy’s forces and returned to his residence and duties as a patriotic citizen, he might have been entitled to the confirmation of his claims. But it is useless to speculate on cases that might be presented. It is sufficient that this claim is without legal merits, and cannot be sustained.
Another objection, not raised in the argument, is decisive of this application. A claimant applying personally is compelled to swear that he did not refuse to participate in the war, and that he did not aid or assist the enemy, and the representative of such a claimant must establish the above facts by proof.
Upon what acts of a person continuing to reside within the limits of our territory, a refusal to participate in the war may be predicated, it is unnecessary to determine. " Such an investigation is not demanded by the facts of the case.
The question properly presented in this cause is, whether he did not participate with the enemy in the prosecution of the war against his own government. But however that may be, his voluntary flight with the troops of the enemy, who were retreating before those of his own country — without compulsion either from his own or from the hostile forces, and for no purpose which can be recognized as lawful — and his remaining on the territory of the enemy as a citizen and subject of that government, until his death, are irrefragable and undeniable proofs of the refusal to participate in the war, in the sense in which the expressions are used in the constitution and laws of the country.
On principles of international law a citizen who has his domicile in a foreign country, even before hostilities break out between that and his own, will, after the commencement of the war, as long as he resides in the hostile country, be considered by his own government as having a hostile character impressed upon him. Vide The Venus, 8 U. S. Cond. p. 107.
The constitution declares that all persons who shall leave the country for the purpose of avoiding a participation in the present struggle, or shall give aid and assistance to the present enemy, shall forfeit all rights of citizenship and such lands as they may hold in the republic.
The law requires the applicant to prove that he did not refuse to participate in the war, and that he did not aid or assist the enemy. On the principles then of either the general, constitutional or the special law, the applicant is not entitled to the bounty claimed of the government. Had Mexico finally subjugated the country, his deser *(295) tion to her standards, under such adverse circumstances, and domicil-iation on her soil might have been the foundation of a strong claim on the justice or liberality of that government for a portion of the public domain or of the confiscated property of the rebel insurgents. The claimant cannot be allowed any benefit from such equivocal conduct, or rather unequivocal disaffection. He cannot cloak himself with a double character and side with either belligerent as may suit his inclinations or purposes. There is no principle of law or rule of reason which would sanction such duplicity of conduct, and give him equal claims on the bounty of both governments; such tergiversa-tions and contradictions of allegiance are discountenanced by the principles of international law, and are totally repugnant to the rules regulating the conduct of our citizens, and especially to those by which the conduct of applicants for public lands must be tested.
The other points presented are of inferior consequence. There is no proof of the representative capacity of the applicant.
The genuineness of the claim is the principle matter to be tested; but there ought also to be satisfactory proof that the real owner of the claim is before the court. From the view we have taken of this case, it will be unnecessary to remand it for further proceeding.
It is ordered, adjudged and decreed that the judgment of the court below be reversed and that the application be dismissed; and that the appellee pay all costs of suit in conformity with the law.